Filed 6/9/16  P. v. Winn CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>LEBRETTE STACEY WINN et al.,<br><br>        Defendants and Appellants. | B259128/B260219<br><br>(Los Angeles County<br>Super. Ct. No. NA095730) |

        APPEALS from a judgment of the Superior Court of Los Angeles County, Tomson T. Ong, Judge.  Affirmed.

        David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant Lebrette Stacey Winn.

        Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant Eric Avery.

        Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

"Pimp partners" Lebrette Stacey Winn and Eric James Avery were charged with numerous offenses and tried jointly. The jury found Winn guilty of pimping (Pen. Code, § 266h, subd.(a)),[1] pandering (§ 266i, subd. (a)(1)), human trafficking for purposes of pimping or pandering (§ 236.1, subd. (b)), forcible sodomy (§ 286, subd. (c)(2)(A)), forcible rape (§ 261, subd. (a)(2)), aggravated mayhem (§ 205), and kidnapping (§ 207, subd. (a)). The trial court sentenced him to a state prison term totaling 47 years, 4 months to life. The jury found Avery guilty of pimping a minor (§ 266h, subd. (b)(1)) and human trafficking of a minor for a sex act (§ 236.1, subd. (c)(1)), and further found true an allegation that Avery committed his crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)). After Avery admitted two prison priors (§ 667.5, subd. (b)) and a strike prior (§ 667, subd. (a)(1)), the court sentenced him to a state prison term of 33 years.

Winn and Avery contend their convictions should be reversed. Both argue that their trial attorneys rendered ineffective assistance by failing to seek severance of their trials and by failing to object to improper expert testimony. Separately, Winn maintains his conviction for aggravated mayhem was not supported by sufficient evidence, and that his consecutive sentences for pimping and pandering the same victim violate section 654. Avery separately argues that the seizure and search of his cell phone were illegal, claims that the court abused its discretion by denying his motion to bifurcate the gang allegation and by admitting evidence of the details of the predicate gang offenses and photographs of the offenders' gang tattoos, and contends that the court incorrectly instructed the jury regarding predicate gang offenses. He further asserts that cumulative error requires reversal. Winn joins Avery's arguments that the police unlawfully searched the contents of his cell phone and that the court erroneously instructed the jury.

We affirm the judgments of the trial court.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

## PROCEDURAL HISTORY

The Los Angeles County District Attorney ("the People") filed a joint felony complaint against Winn and Avery on May 20, 2013. Counts 1 through 9 of the complaint pertained to Winn, and counts 10 and 11 pertained to Avery. Approximately one week later, the People amended the joint complaint to add count 12 against Avery, and amended it a second time on June 7, 2013. Although the complaint remained joint, defendants proceeded to two separate preliminary hearings before two different judges. These hearings resulted in the filing of two separate but consecutively numbered informations that shared a single case number.

The People filed a nine-count information against Winn on September 19, 2013. Counts 1 through 6 alleged offenses against victim Sokuntheer "Margaret" S. Count 1 alleged Winn pimped Margaret (§ 266h, subd. (a)); count 2 alleged Winn engaged in human trafficking for the purposes of pandering or pimping Margaret (§ 236.1, subd. (b)); count 3 alleged Winn forcibly sodomized Margaret (§ 286, subd. (c)(2)(A)); count 4 alleged he forcibly raped her (§ 261, subd. (a)(2)); count 5 alleged he pandered Margaret (§ 266i, subd. (a)(1)), and count 6 alleged Winn committed aggravated mayhem against Margaret (§ 205). Counts 7, 8, and 9 named a second victim, Stephanie S. In those counts, respectively, the information alleged that Winn pandered (§ 266i, subd. (a)(1)), kidnapped (§ 207, subd. (a)), and pimped Stephanie (§ 266h, subd. (a)). The information further alleged that all nine counts were serious or violent felonies or offenses requiring registration pursuant to section 290, subdivision (c).

The People filed a two-count information against Avery on October 2, 2013. The counts, numbered 10 and 11, pertained to a single victim, minor J.M. Count 10 alleged that Avery pimped J. (§ 266h, subd. (b)(1)), and count 11 alleged that he engaged in human trafficking of J. with the intent to pimp her (§ 236.1, subd. (c)(1)). The information alleged that both counts were serious or violent felonies or offenses requiring registration pursuant to section 290, subdivision (c). It further alleged that both counts were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(A)), rendering them serious felonies pursuant to

3

section 1192.7, subdivision (c)(28).  The information also alleged that Avery suffered three prior convictions within the meaning of section 667.5, subdivision (b), and that one of them was a strike (§§ 667, subds. (b)-(j), 1170.12).

The court set both defendants for trial on July 28, 2014.  Just before the joint trial began, the People filed a first amended information "incorporating both defendants"; it consolidated the two informations into one, keeping the prior allegations and count numbers the same. Neither Winn nor Avery moved to sever.  Avery moved to bifurcate the gang allegation, but the court denied his motion.

The jury found both defendants guilty as charged and found the gang allegation against Avery true.  Avery admitted two prison priors (§ 667.5, subd. (b)), a strike prior (§ 1170.12, subd. (b)), and a five-year enhancement (§ 667, subd. (a)(1)).

The court sentenced Winn to a total of 47 years, 4 months to life in state prison.  The court sentenced Winn to an indeterminate term of seven years to life on the aggravated mayhem count (count 6).  The remaining counts all involved determinate sentences.  The court used count 2 (human trafficking of Margaret) as the base count and sentenced Winn to the high term of 20 years "to run consecutive to all counts and allegations herein."  The court sentenced Winn to the high term of six years on two other counts involving Margaret, pimping (count 1) and pandering (count 5), and stayed both of those sentences pursuant to section 654.  The court sentenced Winn to the high term of eight years on the remaining counts involving Margaret, forcible sodomy (count 3) and forcible rape (count 4), and ordered both of those sentences to run consecutively.  The court noted it did not "see any 654 issues" on the three counts pertaining to Winn's victimization of Stephanie and sentenced Winn to one-third the midterm on all of those counts: one year, four months on the pandering count (count 7); one year, eight months on the kidnapping count  (count 8); and one year, four months on the pimping count (count 9), all to run consecutively.  Winn received credit for a total of 563 days.

The trial court sentenced Avery to a total of 33 years in state prison.  The trial court used count 11 (human trafficking) as the base offense and sentenced Avery to the high term of 12 years, which it doubled to 24 years pursuant to section 1170.12.  The

4

court added the high term of four years for the gang enhancement (§ 186.22, subd. (b)(1)(A)) and an additional five years for Avery's previous serious felony conviction (§ 667, subd. (a)(1)), all to run consecutively. The court sentenced Avery to the high term of six years on count 10 (pimping) but stayed that sentence pursuant to section 654. The court credited Avery with 627 days.

Both defendants timely appealed.

**FACTUAL BACKGROUND**

The following evidence was adduced at trial, primarily through the testimony of victims Margaret, Stephanie, and J. Additional facts pertinent to the issues raised by defendants on appeal will be discussed as necessary in connection with those issues.

## I. Victim Margaret

In January 2013, victim Margaret was a 20-year-old community college student. She lived in Long Beach with her father and brother and had no source of income aside from her college financial aid.

A friend introduced Margaret to defendant Winn at a Martin Luther King, Jr. parade. Winn told Margaret his name was "Fab" or "John" and gave her his telephone number. Margaret did not have a phone at the time and did not want to call Winn. She encountered him again at a park a few weeks later, however, and spent the afternoon talking with him. During that conversation, Winn told Margaret he could help her get a babysitting job to earn some money. Margaret agreed to accompany Winn to a nearby beach for the ostensible purpose of meeting the parents for whom she would be babysitting.

It was dark by the time Winn and Margaret arrived at the beach near downtown Long Beach. No babysitting clients were there. Instead, Winn informed Margaret that he was a pimp and asked her to try working for him as a prostitute for a month. Winn told Margaret, who had never worked as a prostitute, that she could leave after a month if she did not like it. Margaret accepted Winn's offer because she "had nowhere else to go." She could not go home because it was midnight and she "would have gotten in trouble by [her] brother for going home at that time."

5

Winn and Margaret took the train to Winn's stepmother's house in Watts. Margaret wanted to go home but felt she could not because she did not have money, a transit pass, or a phone. She and Winn spent the night sleeping in his stepmother's living room. The next morning, Winn discussed with Margaret the "rules" of working for him as a prostitute, including what to charge for various sex acts and how to collect money. Winn also directed Margaret to remove her clothes and kneel on the couch. Margaret complied with Winn's request without protest because she was "scared he might do something" to her. Winn took off his pants, put on a condom, and inserted his penis into her vagina. Margaret told Winn she did not like it but "[h]e still stuck it inside me."

Afterward, Winn told Margaret to take a bath and get dressed. He provided her with clothes and high heels to wear, and drove her to what she described as a "track," an area "[w]here girls walk around and wait for cars to stop and ask them if they want some, if they want to have sex." Winn told Margaret to "wave at cars, smile, and if they stop, walk up to the car and ask them if they want some. And if they do, charge them the amount that they want." Each sexual interaction with a customer was called a "date," and Winn directed Margaret to engage in dates "[s]omewhere where the police won't see it." Winn parked nearby, "somewhere where the customer won't see him," and Margaret gave him all the money she earned from each date.

Winn took Margaret to the track repeatedly through February 2013. While she was there, she was not allowed to eat or sleep until Winn decided she was finished working for the day. Winn set quotas for Margaret, telling her that she could rest or eat upon earning, "for example, . . . $400." On four or five occasions when Margaret did not meet her quota, Winn hit her and beat her up by slapping her in the face, punching her in the stomach, or kicking her buttocks. When Margaret was not at the track, she stayed at Winn's stepmother's house in Watts. Winn did not allow Margaret to talk to her family or attend her college classes. Margaret did not call the police because she feared getting in trouble. Margaret got arrested twice, but did not tell the police about Winn because "it was against the rules to tell on him."

6

At some point in February 2013, Margaret took a taxi back to her family's home in Long Beach. Her father paid for the taxi. Margaret did not talk to her family about what she had been doing but felt safe while she was at the house. She was only there for a couple of hours before Winn came by, however. Winn called Margaret on the cell phone he had given her to take calls from customers and threatened to tell her family what she had been doing if she did not go outside. Margaret went outside and found Winn sitting in his car. Winn asked Margaret to give him a hug, and when she got in the car to comply he drove her back to his stepmother's house in Watts. He then took her back to the track, "to make up for [her] running away."

At some point, Winn took Margaret to work in the Valley. She did not make a lot of money there and told Winn she wanted to go home. Instead of taking Margaret home, Winn told Margaret to meet him at a nearby tattoo parlor. Winn's "pimp partner," whom Margaret knew as "Major" and identified in court as Avery, was there with another girl as well. Winn did not allow Margaret to talk to Avery—or any other black male— "[b]ecause they try to steal you away from him." Winn paid for the tattoo artist to design and tattoo the words "Chop Suey" with a dollar sign on Margaret's forehead.[2] Winn did not restrain Margaret during the tattoo process, but he stayed in the parlor the whole time. Margaret told the tattoo artist to stop "because it hurted" [sic]. He stopped for a minute, but continued tattooing Margaret when "Mr. Winn told him to finish it." Margaret did not want the tattoo on her forehead, but never told the tattoo artist that she did not want the tattoo. Margaret did not remember the tattoo artist asking her to sign any permission or liability forms before she got the tattoo. At the time of trial, Margaret had begun the process of having the tattoo removed.

Around March 2013, Winn stopped taking Margaret to the track because she "was getting arrested too much." Winn took photos of Margaret, which he posted online with her cell phone number, under her "working name" of "Kimmy." Margaret arranged dates with the people who replied to the ad; they would meet her at whatever hotel she and

---

[2]Margaret testified that chop suey is a Chinese food dish, and that she was of Chinese and Cambodian ancestry.

Winn were staying at, most frequently a Best Western in Inglewood.[3] Winn left Margaret alone in their shared hotel room only when she was on dates. Margaret called or texted Winn when her dates were over, at which point he would return and collect from her the money she had earned. Margaret testified that Winn would hurt her if she did not give him the money. Winn took away Margaret's state identification card, debit card, and EBT card. He also required her to give him oral sex, engaged in nonconsensual vaginal sex with her on at least one occasion, and inserted his penis into her anus against her wishes on another.

Margaret ran away from the hotel rooms several times, getting a ride from a customer on at least one occasion. Each time, she returned to her family's house in Long Beach. And each time, Winn would come by and threaten to beat Margaret or disclose her behavior to her family unless she got in the car with him. Upon returning Margaret to a hotel room, Winn would punish her, sometimes by hitting her in the stomach and kicking her. On one occasion, he made her kneel on uncooked macaroni for more than two hours, holding cups of water in her hands.

On or about May 15, 2013, Margaret left the hotel with Stephanie, another of Winn's "girls" who is the victim named in counts 7 through 9 of the information. Margaret made it home, but Winn and Avery came by in Winn's car and picked her up again. Margaret sat in the backseat between Avery and another "girl" she knew as "Mocha," the victim J. named in counts 10 and 11. Winn was angry and threw quarters at Margaret's face while he drove everyone back to Avery's room at the Sea Breeze Inn. In the room, and in the presence of Avery and Mocha, Winn made Margaret get naked and lie in a bathtub full of ice water for "maybe an hour and a half." Winn held Margaret's head under the water four or five times, and put a chunk of ice in her vagina.

---

[3]Long Beach Police Department officer Gabriel Carrillo testified that a front desk clerk from the Best Western identified a photograph of Winn as a "regular" at the hotel who was "in the company of different females of different nationalities and they always registered the rooms in their names." The clerk testified at trial that Winn was a "frequent guest" of the hotel but stated that he did not remember seeing him with other people.

Winn ended the punishment when he decided he needed something to eat. Winn and Avery left the hotel room to get food. While they were gone, Mocha helped Margaret dry off and get dressed. When Winn returned to the hotel, he called Margaret and told her to leave the room and go downstairs to his car. Margaret complied and saw Winn, Avery, and Stephanie in the car. Winn, who was driving, told Margaret to get in the backseat with Stephanie. Margaret complied and Winn engaged the child locks to prevent Margaret and Stephanie from opening the back doors. Winn dropped off Avery and told Margaret and Stephanie that "he was going to take us to buy g-strings to wear on the track and he was going to take us to Arizona."

Winn drove Margaret and Stephanie to a mall in Culver City. He left them in the car while he went inside to buy the lingerie. Stephanie suggested to Margaret that they could leave before Winn returned. Margaret was scared, but exited the car with Stephanie after Stephanie managed to unlock the driver's side front door. Margaret and Stephanie ran into "three guys" in the parking lot. The men drove Margaret and Stephanie to a police station, where Margaret talked to a female detective and underwent a medical exam.

The next day, on or about May 15 or 16, 2013, Margaret talked to a male detective, Long Beach Police Department (LBPD) Detective Eduardo De La Torre. Together, they came up with a plan to apprehend Winn. Margaret called Winn and told him Stephanie was wrong to convince her to escape. They agreed to meet at the beach where Winn first asked Margaret to work for him. Detective De La Torre drove Margaret to the beach. On the way, she saw Winn drive by, accompanied by "Major and two girls." Margaret told De La Torre she had seen Winn and ducked down so Winn would not see her; De La Torre testified that she "threw herself on the floorboard" and was terrified. De La Torre alerted uniformed officers who were participating in the ruse, and those officers performed a traffic stop of Winn's car. LBPD Vice Detective Kevin Ong[4] was one of several law enforcement officers who subsequently responded to the scene of the

_____

[4]Detective Ong was not related to Judge Ong, who presided over the trial.

traffic stop.  He testified that Margaret's debit card and identification card were found in the "door slot" of the car.  Ong further testified that the officers' search of Winn's car also recovered "a simulated phallic device" and "a gas mask, which had another simulated phallic device, [which] appeared to be epoxyed onto the filter of [the] gas mask."

Winn and Avery were arrested and taken into custody without incident.

## II.    Victim Stephanie

Stephanie S. was 19 years old at the time of trial in July 2014.  She testified that she met Winn in Long Beach sometime in 2012 and became friends with him.  Winn talked to Stephanie about prostitution a few times in 2012, asking her if she wanted to go with him and make money for him by having sex.  Stephanie told him no.  She also felt insulted when she overheard Winn's father ask Winn if she was his "new hoe [sic] or prostitute."  Stephanie initially testified she did not know why she continued to hang out with Winn, but later explained that she wanted to be friends with him "[b]ecause he was nice."  Winn introduced Stephanie to "Major," whom she identified in court as Avery, in a motel room sometime in February 2013.

At some point in early 2013, Winn took Stephanie to a hotel room.  Two other women were there. Stephanie did not feel like she could leave because Winn was her "way there."  Stephanie had one date and felt "nasty" afterward; she testified both that she did not want to work for Winn and that she "[w]illingly [did] it the first time."  Stephanie gave Winn the money she had earned and he took her home the next morning.

After this incident, Stephanie maintained her friendly relationship with Winn and at some point asked him to take her to get a tattoo.  Winn took her to the tattoo parlor and paid for the tattoo.  In exchange, Winn wanted Stephanie to work for him as a prostitute. He took her to a hotel room, where she saw Margaret and Avery.  Winn had Margaret talk to Stephanie about the "rules" of working for him.  Margaret also told Stephanie that Winn "did things to her, like he made her take ice cold baths and go on her knees and hold water and he had sex with her" even when she did not want to.  Stephanie felt mad

10

and scared of Winn after Margaret told her these things.  Winn advertised Stephanie's services online, and both she and Margaret had dates in the hotel room.

Winn never threatened Stephanie, but she did not want to stay in the hotel and work for him.  Stephanie and Margaret talked about leaving when they were alone together.  During one of those conversations, on or about May 15, 2013, Stephanie called a friend to come pick them up.  The friend drove Stephanie and Margaret to Long Beach.

On direct examination, Stephanie testified that Margaret called the next day and asked Stephanie to bring some clothing to her.  While Stephanie was walking to Margaret's house with the clothes, she saw Winn and Avery drive by in Winn's car.  On cross, however, Winn's counsel confronted Stephanie with text messages and she admitted that she had arranged to meet Winn outside her house.  Stephanie testified on both direct and redirect examination that she did not want to get in the car with Winn when she saw him.  Winn got out of the car, grabbed Stephanie by the arm, and pushed her into the backseat of the car.  Stephanie did not fight Winn because he was much bigger than she was.  Winn took Stephanie's phone and locked the car doors.  He drove to a motel about 20 minutes away.  When Winn pulled into the motel parking lot, Avery got out of the car and Margaret, who had been at the motel and "looked kind of scared," got into the backseat with Stephanie.

As Winn drove, he asked Stephanie and Margaret why they left in what Stephanie thought was a mad tone of voice.  Winn told Stephanie and Margaret that he was going to take their clothes so they could not leave and drive them to Arizona so they could work for him there.  Stephanie was mad when Winn said this, but she did not try to open the car doors to escape because she knew they would not work.

Like Margaret, Stephanie testified that Winn drove her and Margaret around to several stores, looking for lingerie. Stephanie told Winn her head hurt as they approached a mall, so he left Stephanie and Margaret in the car while he went inside to purchase lingerie.  Stephanie told Margaret they were leaving and tried to kick out the back window of the car.  When that did not work, Stephanie went into the front seat, opened

11

the door, and pulled Margaret out of the car. They ran into three men in the parking lot, who drove them to the Hawthorne police station.

### III.	Victim J.

On or about May 15 or 16, 2013, LBPD officers Gabriel Carrillo and Carlos Del Real participated in Detective De La Torre's ruse to apprehend Winn. When De La Torre alerted them that Margaret had spotted Winn, they conducted a traffic stop of the car he was driving. Avery was in the front passenger seat. Carrillo searched Avery and recovered an EBT card bearing the name Tatyana Williams[5] and a key to a room at the Sea Breeze Inn in Inglewood.

Shortly thereafter, Carrillo and Del Real went to the Sea Breeze Inn and used the key to open the door to room 136, which had been rented under the name Tatyana Williams. They found a young woman inside, whom they later identified as J.M. J. told Carrillo that she was staying there with a friend named Ashley. Carrillo showed J. a photograph of a woman he believed to be Tatyana Williams; J. identified her as Ashley.

J. also told Carrillo that Ashley's pimp, a man named Major, was staying in the room. Carrillo showed J. a photograph of Avery, and she identified him as Major. J. also recognized a photograph of Winn. J. refused to give her true name and birthday, however; Del Real testified that she "was lying and uncooperative" and provided him and Carrillo with several names and dates of birth.

At some point during her conversation with Carrillo, J. told him she knew why he was there: "because of the guy who had taken the two Asian girls from the street." J. further stated that she had been in the presence of two female Asian prostitutes. She admitted that she worked as a prostitute as well, and explained that she had met Ashley while working a track. J. initially denied having a pimp. After Carrillo arrested her, however, she told him that Avery was her pimp and that she had been working for him for approximately a year and a half. She also told Carrillo that Avery took nude

---

[5]The record contains two different spellings of Ms. Williams's first name: Tatyana and Tatiana. We use the spellings as they appear in the record.

photographs of her and used them to advertise her services online. Carrillo transported J. to the police station.

At the station, LBPD Missing Person Detective Satwan Johnson interviewed J. Johnson knew J. from previous encounters and had a rapport with her. Johnson testified that J. did not appear to be under the influence and was able to answer questions for the duration of the 45 to 60 minute interview. A recording of the interview was played for the jury.

During the interview, J. told Johnson that she started working as a prostitute when she was 12 years old. She went by the nickname "Mocha." She worked with several different pimps over the years and had been working with Avery for about two months. J. "chose up" Avery to be her pimp, meaning that she started giving her earnings to him instead of another pimp. J. told Johnson she was only 16, but Avery thought she was 19.

J. ordinarily worked a track. Avery also put ads up online so J. could work out of hotels. Avery had another "girl" named Tatiana Williams, whom J. called Ashley. J. was Avery's "bottom girl," meaning that she "[took] care of everything," spent the most time with Avery, and got the most money.

Avery set J.'s nightly earnings quota at $1,000, which J. explained took about seven dates to earn. She gave all of her earnings to Avery, "[b]ecause, that's what I'm supposed to do." Avery would then give her money "to do what we need to do to ourselves, and then the rest of the money I guess he keeps." Avery used some of the money J. and his other "girls" earned to keep them supplied with clothes and marijuana, and paid for them to get their hair and nails done. Avery never paid for her hotel rooms. Instead, J.'s "tricks" would give her money so that she could rent hotel rooms in her name rather than theirs.

J. told Johnson that Avery had a "pimp partner" that she knew by the name of "Chop-something." He had two "girls," both Asian, with whom J. worked the track. J. knew one of them as "Kim." One of them had the pimp partner's name tattooed "[o]n the top of her eyebrow." J. reported that both girls broke the rules by running away from Chop. When he found them, he punished one by making her sit in a tub of ice and

13

throwing quarters at her face.  J. was present for the quarter-throwing and ice bath, but did not help Chop's girl because Avery was there and she did not want to be punished.  J. reported that Chop planned to punish the other girl by taking "her somewhere far and drop[ping] her off."

Avery hit or slapped J. when she did "stupid" things like talk back to him or talk to another black male, but he did not get upset when she had slow nights and did not meet her earnings quota.  J. said she was happy and could leave Avery if she wanted to.  She believed Avery would let her leave and "couldn't do nothing about it."

When Johnson asked if Avery was a gangster, J. responded, "I guess you could say that."  In response to Johnson's follow-up question, "Where is he from?," J. stated "2-3 Babies Insane."

J. was less forthcoming with her testimony at trial. She did, however, identify Major as Avery.  She also explained the concepts of "in pocket" and "out of pocket."  "In pocket" means that a girl is following her pimp's rules and giving him all of the money she earns.  "Out of pocket" means breaking the rules or going to work for another person. The prosecution's expert provided similar definitions of these terms.

## IV.    Pimping, Pandering, and Human Trafficking Evidence

Detective Johnson testified as the prosecution's expert on human trafficking, pimping, pandering, and prostitution.  According to Johnson, pimps use a variety of techniques to recruit and indoctrinate young women into prostitution.  A "Romeo" pimp is "a smooth talking guy who uses mental manipulation to seduce his women into prostitution."  Romeo pimps befriend or become romantically involved with their targets, who "start to develop a dependence on him . . . . very similar to domestic violence syndrome."  "Gorilla" pimps, in contrast, "use sheer aggression and violence" to recruit prostitutes.  They "will just go and kidnap a girl and tell her you work for me now, you are my prostitute and force her to prostitute."  Both types of pimps isolate their prostitutes by moving them away from their families and friends.  "They may take their identification, take their cell phone, or any other personal items that they have and they will restrict them from having contact with their family.  They'll move them around from

14

motel to motel, and city to city, or state to state, keeping them isolated so the girl has to rely on the pimp and all her reliance is based off of him."

A pimp's ultimate goal in indoctrinating and isolating a prostitute is to get her on "automatic." Johnson testified that automatic means "she will go out and prostitute without the pimp supervising her. He doesn't have to get her up in the morning or drive her around, she will get up herself and she will go out and prostitute, whether that's where she is advertising herself online or if she is walking the track. She will go out there on her own and initiate contact with dates and make money and bring it back to the pimp." Additionally, a pimp's "bottom girl," who is really "the top girl in the pimp stable," can assist him with supervision of his prostitutes and day-to-day operation of his pimping enterprise. A pimp benefits when his prostitutes are on automatic or overseen by other prostitutes because he is insulated from law enforcement. "She's taking all the risk and he is reaping all of the reward."

Johnson testified that the reward to pimps can be great. On average, prostitutes make their pimps "between $150- and $300,000 a year," in tax-free money. Pimps use a small portion of the money to purchase fast food, cheap lodgings, and outfits for their prostitutes. Pimps also pay for their prostitutes to get their hair and nails done, "to keep her looking good so that she can make money for them." Pimps keep the remainder of the money for themselves. Johnson testified that pimping is so lucrative and relatively low risk that a lot of gang members have transitioned away from selling drugs to working as pimps. Gangs control "tracks," or streets with large numbers of motels on them where prostitutes commonly loiter.

According to Johnson, pimps treat their prostitutes like slaves or property. Often, they make their prostitutes call them "Daddy," or use a crown symbol to demonstrate their position of authority. In some cases, pimps "brand their women to show that she is my property, I own her." Even though there are no physical restraints placed on prostitutes, "[i]n her mind, she believes I can't leave." Pimps reinforce this belief by beating or punishing prostitutes who disobey their rules; "[s]he can't tell him no." Physical violence between a pimp and prostitute is very common. It is also common for

15

pimps to withhold food, sleep, and access to showers from prostitutes who disobey them or fail to meet earnings quotas.

Pimps often work with "pimp partners," other pimps who assist them in supervising their prostitutes. "They may share profits they gain from prostitution together. And they are able to have each other's back, just in case another pimp tries to come up and take one of their prostitutes." Pimp partnerships have become very common "because of the gang involvement in prostitution"; working together, pimps can "control rival pimps who may be coming in their area trying to take their girls." It is also common for pimps who are gang members to partner with pimps who are not.

## V.　　Gang Evidence

LBPD Detective Chris Zamora testified as the prosecution's gang expert. Zamora was familiar with the Baby Insane clique of the Insane Crips gang because he had investigated its criminal activity for 11 years. He testified that the Insane Crips gang had been in the Los Angeles area since the 1980s and was the largest Crips gang in the county with "conservatively 900 members dating back to 1970." Baby Insane is a popular and aggressive clique within the Insane Crips gang. Baby Insane members use certain symbols to identify themselves, including the Cleveland Indians and Atlanta Braves baseball team logos, the number 23, and the color red. The primary activities of the Insane Crips as a whole and the Baby Insane clique in particular include assault, residential and commercial burglary, drug sales, prostitution and human trafficking, "escalating all the way up to murder."

In gang culture, the commission of violent acts has long instilled fear with rival gangs and burnished the reputations of the perpetrators. According to Zamora, "[m]oney is just as important now." The ability to control the streets and engage in criminal activity without repercussions also increases a gang's reputation. Recently, the Insane Crips have been getting involved with pimping and human trafficking in Long Beach "because of the large amount of money that's involved." Gang members may associate with nonmembers to make more money and have the nonmembers "bridge the gaps"

between other gangs' territories. The nonmembers benefit from the fear and respect that their association with a member of the gang can provide.

Zamora was familiar with three gang members who previously had been convicted of crimes. Thomas Vinson was an Insane Crips member who was convicted of murder and attempted murder for the benefit of the gang in 2009 after starting a fight at a high school football game and killing "an honor roll student" with no connection to the gang. The prosecution showed the jury photos of Vinson's gang-related tattoos, including a 2-3 on his triceps, a Cleveland Indians mascot on his neck, and a "K" meaning "snitch killer" just under the ear. Adam Manning was a member of Baby Insane who was convicted of robbery and assault with a firearm in 2011, and was later convicted of pimping three minors. The jury also saw photos of his gang-related tattoos, a 23 and Cleveland Indians logo on his chest. Brandon Ryder was a member of the Insane Crips who was convicted of human trafficking, pimping, and pandering for the benefit of the gang in 2012. Zamora testified that he held a woman against her will and threatened her with violence to get her to commit acts of prostitution.

Zamora also was familiar with Avery, whom he opined was a member of the Baby Insane Crips. Zamora based his opinion on Avery's contacts with and self-admissions to law enforcement, gang-related tattoos, and facts surrounding the instant case. Zamora testified that Avery had a very large B tattooed in the center of his chest, with a smaller I and G inside of it; in Zamora's opinion, that stood for Baby Insane gang. Avery also had a Cleveland Indians logo on his lower chest and a 23 on his hand. Zamora added Avery to a gang injunction in 2013. As for Avery's self-admissions, Zamora did not hear them personally but had spoken to other officers who had documented Avery's gang affiliation on field identification cards and booking sheets. After hearing a hypothetical that mirrored the testimony related by J., Zamora opined that the pimping and human trafficking described in the hypothetical "was committed for the benefit of, at the direction of and in association with the Insane gang with the specific intent to further and promote gang activity."

## DISCUSSION

17

## I.    Joint Contentions

### A    Severance

Both defendants contend that they were denied effective assistance of counsel because their attorneys failed to seek severance of their trials.  We are not persuaded.

To prevail on a claim of ineffective assistance of counsel, a defendant must make a two-pronged showing. First, he or she must "show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)  "Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.  When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.  It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)  "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

"There is a statutory preference for joint trials of jointly charged defendants." (*People v. Masters* (2016) 62 Cal.4th 1019, 1048.)  Section 1098 provides in pertinent part that defendants who are charged jointly "must be tried jointly, unless the court order[s] separate trials." (§ 1098.)  It further vests the trial court with discretion as to how to divide multi-defendant cases, and clarifies that "where two or more persons can be jointly tried, the fact that separate accusatory pleadings were filed shall not prevent their joint trial." (*Ibid.*)  Accordingly, to prevail on their ineffective assistance claims, defendants must establish that (1) had a motion to sever been made, the court would have

18

abused its discretion in denying the motion, and (2) they were prejudiced by the lack of such a motion. (See *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 938 (*Calderon*).)

The Supreme Court has identified several factors trial courts should consider when presented with a motion for separate trials of codefendants. These factors include "an incriminating confession that prejudicially associates codefendants; prejudicial association with codefendants; likely confusion from evidence on multiple counts; conflicting defenses; and the possibility that at a separate trial a codefendant would give exonerating testimony." (*Calderon*, *supra*, 87 Cal.App.4th at p. 938.) These factors are not exclusive, however, "and almost all of the multi-defendant cases involve defendants who are charged with crimes arising out of the same episode, rather than on separate occasions." (*Ibid.*)

When "crimes arising out of separate episodes are alleged," the analysis becomes more akin to that performed under section 954 (*Calderon*, *supra*, 87 Cal.4th at pp. 938-939), which permits joinder in a single accusatory pleading of "two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts," and leaves severance to the court's discretion. When exercising that discretion, courts are supposed to consider "(1) whether evidence of the crimes would be cross-admissible; (2) whether some charges are likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a strong one, or with another weak case; and (4) whether any of the charges is a potentially capital offense." (*Calderon*, *supra*, at p. 939, citing *People v. Marshall* (1997) 15 Cal.4th 1, 27.) If the statutory requirements of joinder under section 954 are satisfied, "joinder is error only if prejudice is clearly shown." (*People v. Scott* (2011) 52 Cal.4th 452, 469.) Thus, whether the issue of severance is considered under section 1098 alone or both sections 954 and 1098, it lies within the court's discretion. To show their counsel performed deficiently, defendants must demonstrate the trial court would have abused its discretion

in denying a motion to sever had one been made. Defendants have not carried that burden here.

Defendants focus primarily on the section 954 factors. We begin our analysis with the second factor, whether the joined charges were unduly inflammatory, because "'even if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion.' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 849-850; see also *People v. Myles* (2012) 53 Cal.4th 1181, 1201.) Here, Winn was charged with pimping, pandering, human trafficking, forcible rape, forcible sodomy, kidnapping, and aggravated mayhem. These charges, while undoubtedly egregious and inflammatory, are at best only minimally more so than those lodged against codefendant Avery—pimping a minor and human trafficking a minor for the benefit of a criminal street gang. Even though the alleged crimes were committed at different times and at different places, and against different victims, they involved common elements. (See *Coleman v. Superior Court* (1981) 116 Cal.App.3d 129, 135.) All of the charged offenses related to sex crimes and human trafficking and thus were similar in nature. They also were committed only by defendants, whom multiple percipient witnesses characterized as "pimp partners" and described as being in the company of one another while offenses were being committed, and were committed within the same time frame. In short they were joinable under sections 954 and 1098, and were not unduly inflammatory against either defendant.

In arguments implicating all three relevant section 954 factors—cross-admissibility of evidence, inflammatory charges, and possible spillover effects resulting from the joinder of a weak case to a strong one—both defendants contend that they were prejudiced by unduly inflammatory evidence pertinent only to the other. Avery contends that the joint trial "resulted in the jury hearing all about Winn's violent, cruel, and barbaric behavior[,] permitting it to conclude appellant was guilty by association," as well as the jury hearing that he and Winn were "pimp partners." Winn argues that the

20

testimony of gang expert Zamora "was particularly inflammatory and could not help but prejudicially associate appellant with Avery." We are not persuaded that the trial court would have abused its discretion in denying a motion to sever on these grounds. Multiple witnesses testified that Winn and Avery were pimp partners and that both were present at various events; their trials would not necessarily have been devoid of evidence concerning the other even if they had been separated. Indeed, defendants concede that some evidence, particularly the expert testimony offered by Johnson, was cross-admissible; they argue only that such evidence generally was "minimal and of insignificant import." The relative importance of evidence is a matter for the jury's consideration, and it would not have been an abuse of the trial court's discretion to allow the jury to make that assessment as to the concededly cross-admissible evidence in this case.

As to the third (and final relevant) section 954 factor, Avery contends that his case was "far weaker than that of Winn's" and that he accordingly was prejudiced by the spillover effect from evidence pertaining to Winn's case. In particular, he contends that J. was the only percipient witness offered to prove the charges against him, and that she "was not a credible witness." Avery contrasts this with the case against Winn, which he characterizes as "stronger with Margaret and Stephanie testifying and offering corroborating testimony." We disagree that the cases were so disparate in strength that it would have been an abuse of discretion not to sever them. (See *Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1284 [noting that cases finding an abuse of discretion "have required extreme disparity between weak and strong cases"].) The cases against both defendants rested heavily upon the testimony of percipient witnesses, all of whom had potential credibility issues but corroborated one another all the same. It is true that defendant Avery faced fewer charges than defendant Winn, but the charges were similar and did not render the case against Avery inherently weak. Nor were there so many charges that the jury was likely to become confused as to what evidence pertained to which charge and which defendant.

21

Additionally, the record indicates that the jury was made aware that certain evidence pertained only to one defendant or the other, and that it had an obligation to consider the charges and defendants separately. Winn's counsel specifically asked gang expert Zamora on cross-examination to clarify that his testimony "referred to Mr. Avery," which Zamora did. Moreover, and more importantly, the court instructed the jury that it had to "decide separately whether each of the defendants is guilty or not guilty," and that it had to "decide each Count separately." Thus, to the extent there may have been a basis for the court to sever the trials had a motion to do so been made, the court would have acted within its discretion by keeping the trials together and instructing the jury as it did.

Ultimately, none of the relevant section 954 factors compelled the severance of defendants' trials. Accordingly, the trial court would have been well within its discretion to deny a severance motion had one been made—and making such a motion likely would have been futile. "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price*, *supra*, 1 Cal.4th at p. 387.) Furthermore, to the extent such argument is relevant where defendants did not make a motion to sever (see *People v. Rogers* (2006) 39 Cal.4th 826, 851), we are not persuaded by Avery's contention that the joinder actually resulted in gross unfairness amounting to a denial of due process (*People v. Myles*, *supra*, 53 Cal.4th at p. 1202). There is simply no indication that the evidence relating to Winn was so inflammatory or otherwise prejudicial to Avery as to call into question the integrity of his convictions. Neither Avery nor Winn has demonstrated ineffective assistance stemming from their counsel's failure to seek severance.

## B.    Expert Testimony

Defendants both contend that human trafficking expert Johnson improperly opined on the ultimate issue of their guilt, depriving them of their rights to due process and a fair jury trial. Neither defendant objected to Johnson's testimony on these grounds at trial,

however.[6] Their ability to raise the issue directly accordingly is foreclosed. (Evid. Code, § 353, subd. (a); see *People v. Doolin* (2009) 45 Cal.4th 390, 448.) Both defendants attempt to avoid the forfeiture by arguing that their trial attorneys were ineffective for failing to object to the admission of the contested testimony. We conclude that the testimony was inappropriate and that defense counsel performed deficiently by failing to object at trial. Nonetheless, we conclude that counsel did not render constitutionally ineffective assistance because defendants have not demonstrated a reasonable probability of a more favorable trial outcome absent this error.

### 1.      Standard of Review

As discussed above, a defendant can prevail on an ineffective assistance of counsel claim only by showing both that trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, absent counsel's errors, the outcome of the trial would have been different. (*Mai*, *supra*, 57 Cal.4th at p. 1009.) "'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citation.]" (*People v. Carrasco* (2014) 59 Cal.4th 924, 985.) That said, a defendant can demonstrate ineffective assistance of counsel if he or she can demonstrate (1) that an objection likely would have been sustained—i.e., that the evidence was inadmissible; (2) that there was no legitimate tactical reason for counsel not to object to the evidence; and (3) that a different result was reasonably probable if counsel had objected. Defendants satisfy the first two criteria but miss the mark on the third.

### 2.      Challenged Opinion Evidence

During his testimony, and frequently at the prosecutor's behest, Detective Johnson repeatedly referred to victims Margaret, Stephanie, and J. by name and used their trial

---

[6]Winn's counsel did not object to Johnson's testimony at all, though he did object to a question Avery's counsel asked Johnson on cross-examination on the ground that it assumed facts not in evidence. These objections do not encompass the claims defendants raise on appeal. (See *People v. Valdez* (1997) 58 Cal.App.4th 494, 505, 507.)

testimony to illustrate for the jury common aspects of the pimp-prostitute relationship. We give several examples:

"[Prosecutor]: I think you described a few methods for isolation, are those similar to the methods used to retain control over a prostitute and keep her on automatic?

"[Johnson]: Yes. Well, first of all, once a girl decides to go with a pimp, she is his property. The young girl who testified today, Stephanie, talked about an instance where she went out and she was forced into a car by Winn and even though she didn't want to go, she felt compelled to go because he is bigger than her, and he's telling her to go, and I can't tell him no.

"[Prosecutor]: Now, are you familiar with testimony and statements of the other female, Margaret, that if she did leave there would be punishment for running away?

"[Johnson]: I didn't hear that testimony, but that's very typical. If you go back again, like I said, the prostitute is the pimp's property. That analogy is very similar to the slave and slave master. The slave has to do what the slave master says. If the slave doesn't want to do what the slave master says, she will be punished. It's the same thing. And to the extent in some cases, these pimps will brand their women to show that she is my property, I own her. And that signals the pimp to the other pimps that this property belongs to me and also signals to the prostitute that I own you and you are not free to leave. And even if you do leave, you will always bear my mark or scar."

"[Prosecutor]: I think we talked about it a little bit earlier with the gorilla pimp, but is physical violence common between a pimp and a prostitute?

"[Johnson]: Very common.

"[Prosecutor]: How so?

"[Johnson]: The violence is used to keep control of her and to constantly remind her who is the boss, who is in charge. Like I said, if she is out of the pocket - - and out of pocket could mean a number of things, she is looking at other male blacks, she is not following his rules. [¶] And I'll go back to [J] yesterday. [J] came into this courtroom, and when she was here, she was very hostile when it came to testifying. Snitching on

24

your pimp is out of pocket.  The minute she walked in this courtroom, she immediately went in pocket.  So if she's snitching on her pimp, she is out of pocket.

"[Prosecutor]:  What is choosing up?

"[Johnson]:  Choosing up is when a prostitutes [sic] chooses another pimp over hers. There are a number of ways that choosing up can happen.

"[Prosecutor]:  Can you describe those for us?

"[Johnson]:  For instance, a lot of prostitutes will tell you that they can't make eye contact with a male black.  For instance, yesterday Judge Ong asked [J] to identify Major, who she described was Major, which is defendant Avery, and she wouldn't make eye contact with him.  The reason she wouldn't make eye contact with him is because if she made eye contact with him, she is out of pocket."

### 3.    Analysis

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801)."  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)  Expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (Evid. Code, § 801, subd. (a).)  Testimony in the form of such opinions that are otherwise admissible "is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (*Id.*, § 805.)  Likewise, an expert may express opinions based on hypothetical questions that track the evidence in the case.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).)

However, an expert may not opine directly on a defendant's guilt of the charged crimes.  (*Vang*, *supra*, 52 Cal.4th at p. 1048.)  "'The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue.  [Citations.]  "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact.  To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt."'  [Citations.]"  (*Ibid.*)  Courts accordingly have concluded that expert

25

testimony is not admissible where the expert offers an opinion "'as to what type of pimp Mr. X or [the defendant] is'" (*People v. Leonard* (2014) 228 Cal.App.4th 465, 492-493), as to whether he or she observed "'patterns of behavior in pimping in manipulation and control of women in the testimony you heard today'" (*ibid.*), and as to whether there was evidence in a case to contradict a victim's testimony that she was "'assaulted by someone by the name of James Spence'" (*People v. Spence* (2012) 212 Cal.App.4th 478, 488, 508-509).

There is no question that the esoteric culture of pimping, prostitution, and human trafficking is sufficiently beyond common experience that Johnson's expert opinion on those matters was admissible to assist the trier of fact. It is equally clear, however, that Johnson's testimony extended well beyond a general explanation of a culture with which jurors were likely to be unfamiliar. His opinions about witnesses' testimony and in-court behavior were not predicated on proper hypotheticals and reasonably can be interpreted only as unhelpful comments on defendants' guilt or innocence on the charges of pimping, pandering, and human trafficking. (See *People v. Leonard*, *supra*, 228 Cal.App.4th at p. 493.) The jurors were just as qualified as Johnson to interpret witness behavior after he explained general pimping framework to them. (*Ibid.*; see also *Vang*, *supra*, 52 Cal.4th at p. 1048.)

We are not persuaded otherwise by the People's reliance on *People v. Lindberg* (2008) 45 Cal.4th 1 and *People v. Valdez, supra,* 58 Cal.App.4th at p.494. The jury in *Lindberg* found the defendant guilty of first degree murder and found true several special circumstance allegations, including the hate-murder special circumstance that the victim was intentionally killed because of his or her race, color, religion, nationality, or country of origin (§ 190.2, subd. (a)(16)). (*Lindberg*, *supra*, at p. 6.) The defendant argued that his conviction was predicated upon improperly admitted expert testimony that he was a white supremacist. (*Id.* at p. 48.) The Supreme Court rejected this contention, concluding that the trial court did not abuse its discretion by admitting the challenged testimony. It reasoned, "The expert stated no opinion as to defendant's guilt or the truth of the special circumstances. His opinion that defendant was a White supremacist did not

26

bind the jurors on this point or preclude them from considering other relevant evidence."
(*Id.* at p. 49). *Lindberg* is distinguishable because the defendant there was not charged
with being a white supremacist; the expert's opinion that he was, therefore, could not
reasonably be construed as an opinion on the defendant's guilt of the charged crime.
Here, however, defendants were charged with pimping, and Johnson unambiguously
opined that the alleged victims' testimony and behavior established the truth of those
charges.

*People v. Valdez* similarly is distinguishable. There, the expert opined that the
defendant acted for the benefit of a gang. (*People v. Valdez*, *supra*, 58 Cal.App.4th at p.
507.) The Court of Appeal concluded that this opinion "was not tantamount to an
opinion of guilt or, in this case, that the enhancement allegation was true, for there were
other elements to the allegation that had to be proved." (*Id.* at p. 509.) The court further
explained that the opinion was of assistance to the jury. (*Id*.) Johnson's opinions were
not helpful to the jury because they were tantamount to an opinion of guilt. He
specifically and repeatedly referred to the defendants as pimps; defendants' status as such
was a factual question that the jury was capable of resolving.

The People have not suggested, and we cannot conceive of, any rational tactical
purpose for trial counsel's failure to object to Johnson's plainly improper testimony. We
accordingly conclude that counsel's performance in this regard fell below an objective
standard of reasonableness. We further conclude, however, that defendants have failed to
show the prejudice necessary to establish ineffective assistance of counsel. Conviction
on all counts was supported by admissible—and overwhelming—evidence of defendants'
guilt. Contrary to Winn's assertions that the evidence against him was "relatively weak,"
two victims offered the jury dovetailing testimony that Winn lured them into prostitution,
kept them from their friends and families, and profited from these exploits. Their
testimony was buttressed by that of a third victim, as well as testimony from several law
enforcement officers involved in the ruse leading to Winn's arrest. Although Margaret's
testimony provided the only evidence of sodomy and forcible rape, and Stephanie's the
only evidence of her kidnap, the testimony of a single witness is sufficient to support a

27

conviction unless it describes facts or events that are physically impossible or inherently improbable. (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) The same is true with respect to J.'s testimony about her relationship with Avery. The jury was entitled to credit her recorded testimony over the reluctant testimony she gave in court, particularly where Johnson had explained (in unobjectionable testimony) the workings of pimp culture, J. was found in a hotel room to which Avery had a key, and Margaret corroborated portions of her testimony.

Additionally, the court instructed the jury with pattern instructions aimed at educating the jurors as to their role in the proceeding and their responsibility for making certain determinations. Using CALJIC No. 2.20, the court instructed the jurors that they were "the sole judges of the believability of a witness and the weight to be given the testimony of each witness." Using CALJIC No. 2.80, the court reminded jurors that they were not bound by the opinion of any expert. These instructions, which we presume the jury understood and followed (*People v. Myles*, *supra*, 53 Cal.4th at p. 1212), further ameliorated any possible prejudice caused by Johnson's inappropriate testimony.

II.     Winn's Contentions

        A.      Aggravated Mayhem

        Winn argues that the evidence was insufficient to support his conviction for aggravated mayhem against Margaret. We disagree.

        "In determining whether the evidence is sufficient to support a conviction . . ., 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Rather, the reviewing court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Vy* (2004) 122

Cal.App.4th 1209, 1224, italics omitted.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being . . ." (§ 205.) Aggravated mayhem is a specific intent crime that requires the specific intent to cause the maiming injury, which in this case was the "Chop Suey" tattoo applied to Margaret's face at Winn's direction. (*People v. Park* (2003) 112 Cal.App.4th 61, 64; *People v. Ferrell* (1990) 218 Cal.App.3d 828, 833.) The requisite specific intent to maim cannot be inferred from the injury itself but may be inferred from other facts and circumstances. (*People v. Park*, *supra*, 112 Cal.App.4th at p. 64.)

Winn does not dispute that a tattoo may be considered permanent disfigurement even when it may be possible to remove it. (*People v. Page* (1980) 104 Cal.App.3d 569, 577-578; see also *People v. Newby* (2008) 167 Cal.App.4th 1341, 1346-1348.) Instead, he contends that nothing in the record supports a finding that he applied any physical force or threats to compel Margaret to get the tattoo, forced her to consent to the tattoo for the purposes of punishing, vexing, annoying, or injuring her, or "said or did anything showing any extreme indifference toward Margaret." He further asserts that Margaret "made no obvious protests" and "most certainly could have complained to the tattoo artist that she did not want the tattoo or that she was not consenting to its application." These arguments are not persuasive.

Nothing in the statute setting forth the crime of aggravated mayhem requires the defendant to directly apply physical force or threats to inflict the permanently disfiguring injury; it merely requires the defendant to "intentionally cause" the injury. The record contains ample evidence that Winn caused the "Chop Suey" tattoo to be applied to

29

Margaret's face. Margaret testified that Winn ordered her to meet him at a tattoo parlor after she asked him to take her home. The jury could infer that Margaret obeyed Winn because he had conditioned her to believe that she would be punished if she did not: Margaret testified about cruel punishments Winn had inflicted upon her when she disobeyed his orders, and Johnson testified that pimps commonly perpetrate physical and psychic punishments upon prostitutes working for them. The jury also heard that Winn told the tattoo artist to emblazon the words "Chop Suey" on Margaret's forehead and paid him to design and apply the tattoo. Winn supervised the tattooing process in the company of his "pimp partner" Avery, and directed the tattoo artist to complete the tattoo after Margaret asked him to stop because it was hurting her. The jury could infer from this evidence that Winn, not Margaret or the tattoo artist, was the cause of the tattoo.

The jury also could infer that Winn acted with the requisite malicious intent to injure Margaret. Aggravated mayhem requires intent beyond that associated with an "'indiscriminate attack.'" (*People v. Ferrell*, *supra*, 218 Cal.App.3d at p. 835.) The intent must be to maim rather than attack indiscriminately. (*Ibid.*) Such intent can be inferred from "controlled and directed" actions, or an attack that is "cold and deliberate." (*Ibid.*) The record supports those inferences. After Margaret told him she wanted to go home, Winn subjected her to a custom-designed tattoo that permanently branded her with either (or both) his pimp nickname or a derogatory epithet marking her as a consumable good. He did not seek Margaret's permission or input, and commanded the tattoo artist to continue his work even after Margaret said the tattoo was hurting her. These circumstances demonstrate not only Winn's intent to maim Margaret but also a callous indifference to her bodily integrity and her psychological well-being.

Winn's contention that Margaret "most certainly could have complained to the tattoo artist that she did not want the tattoo or that she was not consenting to its application" is not supported by the record. Johnson testified that prostitutes are conditioned to believe they cannot leave or disobey their pimps. Margaret testified that she was scared to tell her family and the police about Winn; the jury could infer that she would be equally uncomfortable confiding in a tattoo artist, particularly while both Winn

30

and Avery were present. And in any event, Margaret *did* complain to the tattoo artist, who initially stopped the tattoo but continued after Winn directed him to. The jury could have inferred that Margaret believed further complaints would be futile. We are not persuaded otherwise by Winn's suggestion—buttressed by a reference to boxer Mike Tyson and a citation to a tattoo website—that a "reasonable explanation for Margaret not forcefully verbally and physically resisting having the tattoo applied is that she wanted it, or at least had no real objection to having it put there."

### B.     Section 654

At sentencing, Winn asked the trial court "to consider 654 for counts 7, 8, and 9," those involving respectively the pandering, kidnapping, and pimping of Stephanie. He argued that one of the counts should serve as "the underlying offense" and the others as "alternative 654," because "they are the same actions as well." The trial court rejected this argument without explanation and sentenced Winn to consecutive terms totaling four years and four months on counts 7, 8, and 9. Winn now contends that one of the sentences on counts 7 and 9, the pandering and pimping counts, should have been stayed under section 654 because the crimes were incident to the single intent and objective of encouraging Stephanie to become and remain a prostitute to generate revenue for him.[7] We conclude that substantial evidence supported the trial court's ruling to the contrary.

"Section 654 is intended to ensure that punishment is commensurate with a defendant's criminal culpability." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 196.) To that end, subdivision (a) of section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the

---

[7]Winn was convicted in count 7 of violating section 266i, subdivision (a)(1), which defines pandering as "Procur[ing] another person for the purpose of prostitution." In count 9, the jury convicted him of violating section 266h, subdivision (a), which provides in relevant part that "any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, or from money loaned or advanced to or charged against that person by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person, is guilty of pimping, a felony. . . ."

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 thus "limit[s] punishment for multiple convictions arising out of either an act or omission or a course of conduct deemed to be indivisible in time, in those instances wherein the accused entertained a principal objective to which other objectives, if any, were merely incidental." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. omitted.) However, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*Id.* at p. 639, fn. 11.) "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

The nature of a defendant's intent and objective are factual questions, the trial court's determination of which we review for substantial evidence. (*People v. Chung* (2015) 237 Cal.App.4th 462, 469.) Where the trial court makes no specific finding on the issue, a finding that the crimes were divisible is implicit in the judgment and will be upheld if supported by substantial evidence. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717.)

The trial court here impliedly concluded that Winn's pandering and pimping of Stephanie were divisible. This decision was supported by substantial evidence in the record. Although it may be a "general rule" that "any acts of prostitution that follow directly or proximately from the pandering are incident to a single objective and therefore constitute an indivisible transaction with it" (*People v. Deloach* (1989) 207 Cal.App.3d 323, 337), the evidence in this case showed that Stephanie performed discrete acts of prostitution that did not follow "directly or proximately" from Winn's acts of pandering. Winn befriended Stephanie, pandering her for a period of months before she capitulated and engaged in a single act of prostitution. Winn took Stephanie home after that incident. At some later point, she prostituted for him again. The second incident of prostitution was temporally distinct from Winn's pandering. The trial court reasonably could have

32

concluded that Winn had ample opportunity to "reflect and renew his intent" between the incidents, "thereby aggravating the violation of public security or policy already undertaken" by his initial course of conduct. (*People v. Gaio*, *supra*, 81 Cal.App.4th at p. 935.)

Winn's reliance on *People v. Branch* (2010) 184 Cal.App.4th 516 and *People v. Jeffers* (1987) 188 Cal.App.3d 840 (*Jeffers*) is misplaced. In *Branch*, the court noted—but did not substantively address—the People's concession that consecutive sentences for pimping and pandering in that case violated section 654. (*Branch*, *supra*, 184 Cal.App.4th a p. 518.) The facts of *Branch* are distinguishable on the grounds that the defendant's acts of pandering and pimping were immediately proximate to one another (see *id.* at p. 519). In addition, cases are not authority for issues not decided therein (see *People v. Scheid* (1997) 16 Cal.4th 1, 17). Similarly, *Jeffers* merely notes that the trial court stayed sentences for pimping pursuant to section 654 when the defendant was convicted of pandering the same victims. (*Jeffers*, *supra*, 188 Cal.App.3d at p. 849.) The propriety of that decision was not before the Court of Appeal, so *Jeffers* is not persuasive authority on the issue here.

## III. Avery's Contentions

### A. Cell Phone Evidence

Avery argues that the trial court erred when it denied his motion to suppress his statement expressing ownership over a cell phone recovered from the traffic stop. He further contends—and is joined by Winn in arguing—that the cell phone he identified was searched without a warrant in violation of his Fourth Amendment rights. We are not persuaded by the first argument and conclude that the second is forfeited because neither defendant presented it to the trial court.

### 1. Background

Immediately prior to trial, Avery moved in limine to exclude text messages allegedly involving Tatyana Williams (whom J. identified as a prostitute who worked for Avery) that were retrieved from a cell phone recovered during the traffic stop of Winn and Avery. Avery argued that the evidence relating to Williams was hearsay that had "at

33

least a somewhat diminished probative value," was "extremely prejudicial," and was "borderline irrelevant." The People argued that the text messages showed intent "that this individual, Mr. Avery, you know, is receiving money and running other people out of that same motel room that [J.]M. was discovered in." They further suggested that the text messages corroborated J.'s testimony about Tatyana and Avery's pimping operation.

When the court asked if the cell phone from which the messages were obtained belonged to Avery, Avery's counsel responded, "[t]he evidence is going to show they put the phone in front of him and said, hey, is this yours? The officer is going to allegedly say he said yeah, that's my phone." Avery did not move to exclude the text messages or the phone on that basis at that time. The court ruled that the text messages were admissible: "It shows intent of the activity. It shows knowledge of the pimping and human trafficking activity. If he does not deny the statements in there, it shows adoptive admission. This is not unfairly prejudicial. Every piece of evidence against the defendant is prejudicial, otherwise it is not relevant." The court further ruled that lay witnesses Margaret, Stephanie, and J. could testify about the messages because those witnesses know "the modus operandi of the activity, they're expressing lay opinion of what's going on, especially if they [sic] part of the crew of the prostitutes to be offered for public service. . . . It shows modus operandi, and Tatiana is part of that crew."

During trial, Avery made a second attempt to exclude the messages. The court held a hearing pursuant to Evidence Code, section 402 to determine whether the messages should be excluded. At that hearing, Sergeant Eric Hooker testified that Detective Ong recovered four cell phones during the traffic stop of Winn and Avery. The cell phones were taken to the vice office of the police station and placed on Hooker's desk. At the time, Avery was in an interview room "right around the corner" from Hooker's desk. The People stipulated that Avery was in custody at this time.

Hooker testified that he went to the interview room to speak with Avery, and "the very first thing" Avery did was inquire whether "we had his cellular phone." Hooker told Avery he wasn't sure if the police had his phone or not. Hooker then "went back and picked up the cellular phones that were on my desk and brought them back in the room

34

and showed them to him." Hooker said to Avery something to the effect of, "which one is yours or is one of these yours." Avery pointed out a phone that he believed was his, and Hooker handed it to him. Hooker "stood there while he opened it up and looked at the screen when he flipped it open and then he confirmed that was his phone." Hooker took the phone back and returned it and the others back to his desk. He then returned to the interview room to speak with Avery, advising him of his *Miranda* rights at that time. Subsequently, the phone was examined and booked into evidence.

Avery's counsel asked the court to conclude that Hooker's response to Avery's question about the phone—which one is yours or is one of these yours—was designed to elicit an incriminating response and therefore violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and *Rhode Island v. Innis* (1980) 446 U.S. 291 (*Innis*). Counsel argued that Hooker "could have simply done nothing" or "could have said, sorry, you don't get your phone, you are being arrested," or "could have said, well, here are all the phones and then nothing else." He then submitted. After the People mentioned during their argument that Avery might be "collapsing two separate issues, one under the Fifth Amendment and one under the Fourth," Avery clarified that he was "addressing with this motion his statement where he says that this is my phone to the officers and he indicates by word or deed that that is, in fact, his phone. That's the evidence I think should be excluded. If the People can otherwise establish that is his phone, they are free to do that, but I don't think they can lawfully do it with his statements and actions that day. I think that was certainly a violation of the *Miranda* principles."

The court denied the motion to suppress. It ruled that Avery initiated the exchange about the phone and, moreover, that the phone was not relevant in and of itself because "phones itself [sic] are not instruments of the trade. So the fact that they were able to provide the phone and Mr. Avery identified that that is his phone is not an incriminating statement."

The People subsequently elicited testimony about the recovery and contents of the phone from Sergeant Hooker. Hooker testified that Avery identified the phone as his and

that it contained messages such as, "Maybe an hour or two, Daddy" that police believed were from Tatyana Williams.

## 2. Analysis

### a. Statement of ownership

We review de novo the trial court's denial of the motion to suppress Avery's statement that he owned the phone. (*People v. Waidla* (2000) 22 Cal.4th 690, 730.)

A statement obtained from a suspect as the result of a "custodial interrogation" is not admissible in the prosecution's case-in-chief, absent a knowing and intelligent waiver of the right to remain silent, the right to presence of an attorney and, in the case of an indigent suspect, the right to appointed counsel. (*Miranda*, *supra*, 384 U.S. at pp. 444-445; *People v. Elizalde* (2015) 61 Cal.4th 523, 531.) An interrogation is not "limited to express questioning. Instead, the term refers to 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (*People v. Elizalde*, *supra*, 61 Cal.4th at p. 531, quoting *Innis*, supra, 446 U.S. at p. 301, fn. omitted.) However, "all statements obtained by the police after a person has been taken into custody" are not necessarily "considered the product of interrogation." (*Innis*, *supra*, 446 U.S. at p. 299.) "Voluntary statements 'remain a proper element in law enforcement.' [Citation.]" (*Oregon v. Elstad* (1985) 470 U.S. 298, 305.) "'The critical inquiry is whether the unwarned statements preceding a subsequent, warned confession or discovery of derivative evidence are made voluntarily. Where there is no evidence of coercion or a denial of due process in elicitation of the statements, the object of the fifth amendment exclusionary rule—assuring trustworthiness of evidence introduced at trial—is not served by barring admission of the derivatively obtained evidence or statements.' [Citation.]" (*People v. Whitfield* (1996) 46 Cal.App.4th 947, 955.) Thus, the "fruit of the poisonous tree" exclusionary rule does not apply to the fruit of unwarned statements that are not coerced. (*Ibid.*)

The limited evidence in the record reflects that Avery initiated a discussion about his phone with Hooker. The first thing he did when Hooker entered the interview room

36

was ask about the whereabouts of his phone. Avery concedes this query was plainly voluntary and did not violate *Miranda*. Avery contends that Hooker's response to the query, "which one is yours or is one of these yours," was designed to elicit an inculpatory statement, namely a link between him and a phone recovered during the traffic stop. We disagree. Law enforcement officials are permitted to respond to volunteered statements or queries with neutral follow-up comments or questions. (See *Andersen v. Thieret* (7th Cir. 1990) 903 F.2d 526, 532.) Asking Avery if one of the recovered phones was his was a neutral, noncoercive query that was responsive to Avery's unprompted question about his phone. Nothing about the cell phone itself or Avery's ownership of it was incriminatory; in today's society, a large majority of law-abiding people owns cell phones. Our conclusion might be different if Hooker had asked Avery if there was something incriminating on the cell phone, but under the circumstances here we are not persuaded that Hooker's question was reasonably likely to elicit an incriminating response from Avery.

Even if Hooker's question did constitute improper interrogation under *Miranda*, we would conclude that the admission of defendant's statement that he owned the phone was harmless beyond a reasonable doubt. (*People v. Cunningham* (2001) 25 Cal.4th 926, 994.) As Avery argued in trying to suppress the phone, the phone and the text messages it contained were minimally relevant to the People's case against him. His statement that he owned any particular phone was even less so. The statement was mentioned only once during trial and added relatively little to the strong witness testimony against Avery.

### 3.    Phone and contents

During trial, Avery tried to suppress the phone and its contents as irrelevant, minimally probative, and unduly prejudicial. The court denied his motion and admitted the phone. Avery now argues that the phone and its contents should have been

suppressed because the officers searched it without a warrant and therefore violated his rights under the Fourth Amendment.[8]

Neither defendant moved to suppress the cell phones or their contents on this basis below. The People argue that omission should result in forfeiture of the issue here. We agree. "[D]efendants must specify the precise grounds for the suppression of the evidence in question, and, where a warrantless search or seizure is the basis for the motion, this burden includes specifying the inadequacy of any justifications for the search or seizure." (*People v. Williams* (1999) 20 Cal.4th 119, 130.) "Defendants need only be specific enough to give the prosecution and the court reasonable notice. Defendants cannot, however, lay a trap for the prosecution by remaining completely silent until the appeal about issues the prosecution may have overlooked." (*Id.* at p. 131.) Winn and Avery remained silent about the alleged Fourth Amendment violation at trial. As a result, the People had no opportunity to refute this contention and the court had no opportunity to rule on it. Consequently, defendants may not pursue this theory issue now.

Avery contends he preserved the issue because "the prosecutor argued appellant's cell phone was going to be searched no matter what as incident to an arrest and at the time of the search 'the law did not require the officers get a search warrant." Based on

_____

[8]Winn purports to join Avery's argument with respect to his own cell phone. He contends, in entirety, that "Appellant's cell phone was also searched without a warrant and the contents thereof disclosed to the jury which similarly prejudiced his defense." While this single sentence conceivably could be enough to present for our consideration the Fourth Amendment legal issues that Avery thoroughly briefed despite its lack of facts pertinent to Winn or his phone, it is plainly insufficient to present the related issue of ineffective assistance by Winn's own counsel. "Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground. If a party's briefs do not provide legal argument and citation to authority on each point raised, '"the court may treat it as waived, and pass it without consideration. [Citations.]"' [Citation.] 'Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations].' [Citation]." (*People v. Bryant* (2014) 60 Cal.4th 335, 363-364.) Winn has made no attempt to carry that burden here.

these comments, he asserts, "it can be reasonably presumed she (the prosecutor) was referring to the *Riley* [*v. California* (2014) 573 U.S. ___, 134 S.Ct. 2473] decision which set forth a new rule finding police generally may not, without a warrant, conduct a search of a cell phone incident to an arrest." We reject the suggestion that a prosecutor's comments in response to a defendant's motion based on relevance and prejudice reasonably can be construed to raise, refute and preserve for appeal on arguments defendant did not even obliquely make.

Furthermore, Avery affirmatively disavowed any intention to seek suppression of the phone or its contents on Fourth Amendment grounds. He told the court that he was addressing only "his statement where he says that this is my phone to the officers and he indicates by word or deed that that is, in fact, his phone" and sought to exclude that statement as "a violation of the *Miranda* principles." To the extent Avery tried to exclude the phone and its contents, he did so only on relevance and prejudice grounds that he does not reiterate here; he cannot transform those arguments into a search and seizure argument on appeal.

Nor can Avery demonstrate that he was prejudiced by his counsel's failure to raise the Fourth Amendment arguments below. Even if we assume that the arguments would have been meritorious, we cannot conclude on this record that there is a reasonable probability the outcome of the proceedings would have been different absent admission of the cell phone and its contents. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) As we have already noted, the phone and the text messages it contained were minimally relevant to the People's case against Avery. They did, as the People argued and the court ruled, tend to show Avery's knowledge of pimping culture and his modus operandi, and they also corroborated J.'s testimony about Ashley/Tatyana. However, J.'s testimony—which Margaret also corroborated—provided strong evidence against Avery, as did his possession of a key to the hotel room in which J. was found, and testimony from all three victims that he was often in Winn's presence also served to demonstrate his knowledge and modus operandi.

39

## B. Gang Enhancement Allegation

### 1. Bifurcation

Avery contends the trial court erred by denying his motion to bifurcate trial of the gang enhancement allegation. He argues that the gang evidence the jury heard as a result of the court's ruling had no relevance to his guilt and was unduly prejudicial. We are not persuaded that the court abused its discretion in denying the motion to bifurcate. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1048-1050.)

A trial court has the discretion to bifurcate trial of a gang enhancement allegation to mitigate the danger of the jury being improperly influenced by gang evidence when it decides whether the defendant is guilty of the charged crime. (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049.) This is because gang evidence "may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Ibid.*) However, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (*Id.* at p. 1050.) The trial court's discretion to deny bifurcation of gang enhancement allegations is "broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Ibid.*) The defendant bears the burden of persuading the court that the benefits of a single trial are outweighed by a substantial danger of undue prejudice. (*Ibid.*)

Here, as trial was starting, Avery argued to the trial court that the gang enhancement allegation should be bifurcated because "there is really not a true gang aspect to this case." Rather, Avery just "happen[ed] to have been allegedly a member of the Insane Crips at the time that alleged conduct took place." The court denied the motion, ruling that "[t]his is no different than sale of drugs that benefit the gang, you know, the orchestrator of selling drugs for the gang. The proceeds goes [sic] to the operation of the gang. This is a different mode of making money, in this particular case, it's prostitution." In other words, the court concluded that the gang allegation was part

40

and parcel of Avery's offense inasmuch as it tended to show his motive for engaging in the charged conduct. (See *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049 ["Evidence of the defendant's gang affiliation . . . can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."].) This conclusion was well within the court's discretion, particularly where the court assured Avery that it would let him "examine that thoroughly" on cross-examination of the People's gang expert.

Avery contends this case is analogous to *People v. Albarran* (2007) 149 Cal.App.4th 214, 217, in which a divided Court of Appeal concluded a defendant was entitled to a new trial because "certain extremely prejudicial gang evidence was not relevant to the underlying charges [and] the People failed to present sufficient evidence these crimes were gang motivated." We do not agree. The defendant in *Albarran* identified "extremely inflammatory" evidence—including references to the Mexican Mafia and statements that gang members threatened to kill police officers—that, at most, was only tangentially related to the gang enhancement allegation and had no bearing on the charged offenses. (*Id.* at pp. 227–228.) In contrast, the gang evidence here was relevant to Avery's motive for committing the underlying offenses as well as to the gang enhancement allegation. And, as discussed below, it was not unduly prejudicial. Thus, Avery did not meet his burden of clearly establishing a "substantial danger of prejudice" if the gang allegations were not bifurcated. (See *Hernandez*, *supra*, 33 Cal.4th at p. 1051.)

## 2. Admission of Tattoo Photographs and Predicate Crime Details

To prove the gang enhancement allegation against Avery, the People were required to prove that Avery committed his crimes "for the benefit, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).) A "criminal street gang" is an "'ongoing organization, association, or group of three or more persons'" that shares a common name or identifying symbol, has as one of its "'primary activities'" the commission of certain enumerated offenses, and "'whose members individually or collectively'" have committed or attempted to commit certain predicate offenses.

41

(§ 186.22, subds. (f), (j); *People v. Prunty* (2015) 62 Cal.4th 59, 67.)  To make these showings, the People introduced evidence pertaining to three documented Insane Crips and Baby Insane gang members, including photographic evidence of their gang-related tattoos and details of the crimes of which they had been convicted.[9]

Avery objected to the admission of the tattoo photographs, which he characterized as "scary" and minimally probative.  Avery did not object when gang expert Zamora described the details of the crimes the first two gang members committed—the killing of a bystander " honor roll student" during a gang fight at a football game and "an armed robbery where [the gang member] pointed a gun on an individual to steal a cell phone as well as a gold necklace."  Avery did object to testimony concerning another offense one of these two gang members committed, pimping three minors, and also objected to testimony about offenses committed by a third gang member on the grounds that the People should be restricted to presenting evidence of only two predicate acts.  He now contends the court abused its discretion in admitting the "avalanche of testimony as to a vicious homicide, attempted murders, robbery, assault with a firearm, frightening photographs of the convicted felons and their tattoos," which he claims was "irrelevant evidence whose highly prejudicial impact outweighed any minimal relevance it might have had."  We disagree.[10]

The trial court is vested with broad discretion over decisions relating to the admission of evidence.  It may in its discretion exclude evidence if the probative value of

---

[9]Zamora discussed both the Insane Crips and the Baby Insane clique throughout his testimony.  We note that our Supreme Court has held that "the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22(f) must be one and the same." (*People v. Prunty*, *supra*, 62 Cal.4th at pp. 75-76.)  We do not consider whether the prosecution met its burden of satisfying those requirements here because neither Avery nor Winn raised the issue in the trial court or presented it for our review.

[10]Avery includes in an argument sub-heading the contention that the trial court erred by "allowing the prosecutor to elicit evidence of more than two predicate offenses." He does not include any substantive legal argument on this point, however.  We accordingly consider it waived.  (E.g., *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

the evidence is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. (Evid. Code, § 352.) Avery argued that the probative value of the photographs of the gang members' gang-related tattoos was outweighed by the risk of undue prejudice, but the trial court disagreed. The trial court's conclusion was not an abuse of discretion. The People were obligated to prove that Avery's crimes were intended to benefit a criminal street gang, a group of three or more persons that shares a common name or identifying symbol. The photographs were relevant to these disputed facts of consequence. (Evid. Code, § 210.)

Moreover, photographs of common symbols tattooed on known gang members' skin were highly probative evidence that those individuals were part of a criminal street gang with which Avery, who had similar symbols tattooed on his skin, also was affiliated. To the extent the photographs were prejudicial, the court instructed the jury that it could consider the gang evidence only "for the limited purpose of determining if it tends to show that the crime or crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." The court also instructed the jury that it could not consider the gang evidence "to prove that defendant Eric James Avery is a person of bad character or that he has a disposition to commit crimes." We presume the jury followed these instructions. (*People v. Myles*, *supra*, 53 Cal.4th at p. 1212.)

Avery has forfeited any objection to Zamora's testimony about the details of the first two gang members' crimes. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) He contends that his counsel's failure to object to this testimony amounted to ineffective assistance. Yet "'deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citation.]" (*People v. Carrasco*, *supra*, 59 Cal.4th at p. 985.) "'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and  that counsel's actions and inactions can be explained as a matter of

43

sound trial strategy." [Citations.] When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ""'no conceivable tactical purpose'"" for counsel's act or omission. [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 674-675.) Avery has not made that showing here. Indeed, it is easy to conceive of at least one tactical reason why counsel did not object to the evidence detailing the crimes: he may not have wanted to draw additional attention to it.

### 3. Jury Instruction on Predicate Offenses

To prove the gang enhancement allegation, the prosecution must prove that the gang at issue includes members who either individually or collectively have engaged in a pattern of criminal activity by committing, attempting to commit, or soliciting two or more of the offenses enumerated in section 186.22, subdivision (e). (See § 186.22, subds. (b)(1), (e); *People v. Gardeley*, *supra*, 14 Cal.4th at p. 617.) The court instructed the jury that "pattern of criminal gang activity" meant the commission or conviction of two or more of the following crimes: "robbery, assault with a firearm, murder, attempted murder, pimping, pandering, human trafficking, forcible rape, forcible sodomy, and kidnapping." Although evidence in the record showed that members of the Insane Crips and Baby Insane committed all of the crimes the court listed, the crimes of pimping, pandering, human trafficking, and forcible sodomy are not among those enumerated in section 186.22, subdivision (e). Avery contends that the inclusion of offenses not enumerated in section 186.22, subdivision (e) rendered the instruction legally incorrect and constituted prejudicial error because it "allowed the jury to rely on non-qualifying crimes to establish the pattern of criminal gang activity element of the gang enhancement." The People concede "the jury instruction improperly included the crimes of pimping, pandering, human trafficking, and forcible sodomy," but argue that Avery's

44

claim of error[11] is forfeited and that the error was harmless. We conclude that the claim is preserved but agree with the People that the error was harmless.

The People contend that defendants' failure to object to the jury instruction at issue results in a forfeiture of this claim. We disagree. While "'a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language,'" [citation] (*People v. Catlin* (2001) 26 Cal.4th 81, 149), Avery argues that the instruction was not merely unclear or incomplete, but that the inclusion of inapplicable predicate offenses rendered the instruction legally incorrect. Indeed, the People concur with Avery that the instruction was erroneous. We agree that the instruction was erroneous (see *People v. Fiu* (2008) 165 Cal.App.4th 360, 388), and accordingly consider the remaining merits of the claim, that is, the extent to which the error prejudiced Avery.

Avery contends the error is reversible under *Chapman v. California* (1967) 386 U.S. 18, 24 because "the jury could have found the element in support of the gang enhancement based on convictions that did not qualify to establish the pattern of criminal gang activity." The Court of Appeal rejected the same argument in *People v. Fiu*, *supra*, 165 Cal.App.4th at p. 388, which is analogous to this case. In *Fiu*, the trial court took judicial notice of and instructed the jury regarding three predicate offenses, one of which, possession of an assault weapon, was not listed in section 186.22, subdivision (e). (*People v. Fiu*, *supra*, 165 Cal.App.4th at pp. 387-388.) The Court of Appeal concluded that the court incorrectly instructed the jury but found the error harmless because the

---

[11]Winn joins this argument, despite not being charged with the gang enhancement allegation, on the ground that "the fact that he was tried with, and connected to, coappellant Avery as an alleged gang member caused appellant great prejudice which was exacerbated by this erroneous instruction." He does not present any argument clarifying how the instruction exacerbated the alleged prejudice, nor does he explain how an erroneous instruction not relevant to him in any way could warrant reversal of his convictions. We note that "[p]urporting to join in a claim when no colorable argument can be made that the claim is applicable and preserved is akin to raising a frivolous claim in the first instance." (*People v. Bryant*, *supra*, 60 Cal.4th at p. 363.)

gang enhancement allegation "requires proof of only two enumerated offenses in order to prove a pattern of criminal gang activity" and "the remaining two offenses that the trial court took judicial notice of, and instructed the jury regarding, provided the two necessary predicate offenses." (*Id.* at p. 388.) The same is true here: as Avery acknowledges, the court properly instructed the jury that the numerous convictions suffered by gang members Vinson and Manning qualified as predicate offenses that established a pattern of criminal gang activity. We accordingly conclude the error was harmless.

### C.     Cumulative Error

Avery contends that the cumulative effect of the errors in his trial rendered his trial fundamentally unfair and requires reversal. We disagree. A series of trial errors, though independently harmless, may in some cases collectively constitute prejudicial error. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1009.) The few errors that occurred during Avery's trial were harmless, whether considered individually or collectively. Avery was entitled to a fair trial, not a perfect one. (*Ibid.*)

### DISPOSITION

The judgments of the trial court are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, Acting P. J.


MANELLA, J.

46